# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOYCE CIANFRANI, *et al.,* | : | CIVIL ACTION |
| Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| BOROUGH OF CLIFTON HEIGHTS, *et al.*, | : | |
| Defendants | : | NO. 09-46 |

## MEMORANDUM

CAROL SANDRA MOORE WELLS                                                         October 21, 2010
UNITED STATES MAGISTRATE JUDGE

       Plaintiffs Joyce Cianfrani and Lisa Russell have sued the Borough of Clifton Heights and Sergeant Stephen Brown, of the Clifton Heights Police Department, under 42 U.S.C. § 1983 as a result of the events surrounding Sgt. Brown's alleged seizure of Plaintiffs on January 13, 2007. Defendant Clifton Heights has sought summary judgment on the ground that Plaintiffs have not identified a municipal policy or custom that would expose it to § 1983 liability under *Monell v. Dep't of Soc. Services*, 436 U.S. 658 (1978). Defendant Brown has also moved for summary judgment asserting that: (1) Russell's substantive due process claim, duplicative of her excessive force claim, should be dismissed; (2) Russell cannot pursue a bystander liability claim against him; (3) Cianfrani's claim of excessive force is devoid of evidentiary support; and, alternatively, (4) qualified immunity defeats Cianfrani's excesive force claim.

## I. BACKGROUND

       Plaintiffs allege that, on January 13, 2007, Russell was driving her car in Clifton Heights with Cianfrani as her passenger. Complaint at ¶¶ 6-10.[1] They were pulled over by Sgt. Brown and

---

[1] Although the Complaint alleges that the relevant events took place on January 6, 2007, the parties have stipulated that the date should be amended to January 13, 2007. *See* Document No. 20.

another police officer. *Id.* at ¶¶ 11-12. Sgt. Brown handcuffed Russell's hands behind her back, with her handbag still on her wrists; Sgt. Brown or the other officer[2] handcuffed Cianfrani in the same fashion. *Id.* at ¶¶ 15, 19. Plaintiffs allege that they remained handcuffed for over four hours, causing nerve damage to the hands. *Id.* at ¶¶ 15, 17, 19-20.

Plaintiffs were transported to the Clifton Heights Police Station; Cianfrani was placed handcuffed on a bench; Russell was placed handcuffed in a holding cell. *Id.* at ¶ 21. Russell was then told that she had been arrested, because her former boyfriend, Richard Carney, had accused her of breaking into his apartment and assaulting him. *Id.* at ¶ 22. While Russell was in the holding cell, Sgt. Brown, amidst Russell's protests, unzipped her jacket and began rubbing his hands over her breasts and between her legs. *Id.* at ¶ 24. Several hours later, Carney came to the police station and retracted his prior statement and complaint against Russell. *Id.* at ¶ 26. Nevertheless, Sgt. Brown and another police officer continued to detain Plaintiffs, stating that they would be held until they both signed confessions. *Id.* at ¶ 27. As a result of this coercion, Russell eventually signed a confession and, after more than four hours in police custody, Plaintiffs were released. *Id.* at ¶ 28.

In Count I of the Complaint, Plaintiffs allege that Sgt. Brown caused their false arrest and imprisonment. Complaint at ¶ 35. Count II alleges that Sgt. Brown subjected them to excessive force in violation of the Fourth Amendment. *Id.* at ¶ 39. Russell alleges in Count III that Sgt. Brown violated her right to due process when he inappropriately touched her breasts and between her legs. *Id.* at ¶ 45. In Count IV, Plaintiffs allege that Sgt. Brown failed to intervene to protect Plaintiffs from constitutional violations by his fellow police officer. *Id.* at ¶¶ 50-52. In Count V, Plaintiffs allege that Clifton Heights is liable to them based on a policy, practice or custom of condoning the

---

[2] Discovery has established that Cianfrani was handcuffed by Police Officer Robert McCaughan after Sgt. Brown ordered him to do so. *See* Deposition of Joyce Cianfrani ("Cianfrani Dep.") at 35; Deposition of Robert McCaughan ("McCaughan Dep.") at 47-48; Deposition of Sergeant Stephen Brown ("Brown Dep." at 88).

illegal and unconstitutional arrests of citizens as well as the use of excessive force by its police department. *Id.* at ¶¶ 54-58.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). An issue of fact is genuine only if there is sufficient evidence that would permit a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). An issue of fact is material only if it might affect the outcome of the suit under the governing law. *Id.* at 248. Credibility determinations are not appropriately made by the judge in summary judgment but must be left for the jury. *Id.* at 255.

The movant may support his motion with affidavits, depositions, and answers to interrogatories. Fed. R. Civ. P. 56(e)(1). Once he has done so, the nonmovant "may not rely merely on allegations or denials of [her] own pleading; rather [her] response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). If the nonmovant "does not so respond, summary judgment should, if appropriate, be entered against [the nonmovant]." *Id.*

The burden to demonstrate the absence of a genuine issue of material fact remains with the movant, regardless of which party has the burden of persuasion at trial. *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 896 (3d Cir.), *cert. denied*, 483 U.S. 1052 (1987). If, however, the nonmovant has the burden of proof on an element essential to its case at trial, and does not, after adequate time for discovery, make a showing sufficient to establish the existence of that element, summary

judgment is mandated. *See Celotex*, 477 U.S. at 322. In such a situation, there can be no genuine issue as to any material fact, because a complete failure of proof concerning an essential element of the nonmovant's case necessarily renders all other facts immaterial. *See id.* Consequently, the party moving for summary judgment is entitled to judgment as a matter of law.

### III. DISCUSSION

**A.** *Monell* **Claim**

Clifton Heights argues that Plaintiffs have failed to identify any municipal policy or custom that caused any alleged constitutional violation. Memorandum of Law in Support of Defendant's Motion for Partial Summary Judgment ("Def.'s Mem.") at 6. A municipality cannot be responsible for damages under 42 U.S.C. § 1983 on a vicarious liability theory, *Monell v. Dept. of Soc. Services*, 436 U.S. 658, 691-92 (1978), and "can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (emphasis as in original). A plaintiff must identify a municipal policy or custom that amounts to deliberate indifference to the rights of people with whom the police come into contact. *Canton*, 489 U.S. at 388. This typically requires proof of a pattern of underlying constitutional violations. *Berg v. County of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000) (*per curiam*). Proving deliberate indifference in the absence of such a pattern is an extremely difficult task. *Id.* Policy is established by showing that a "'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issued an official statement of policy." *Jimenez v. All American Rathskeller, Inc.*, 503 F.3d 247, 250 (3d Cir. 2007) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)). Municipal "custom" exists, when, although not authorized by law, the "'practices of state officials [are] so permanent and well settled' that they operate as law." *Id.* (quoting *Monell*, 436 U.S.

at 690).

Plaintiffs' municipal liability claims can be divided into two categories here: (1) the failure to properly train its police officers on the proper procedures for searching female detainees; and (2) the failure to adequately investigate and discipline claims of misconduct lodged against police officers that involve searches of women. Plaintiffs' Memorandum of Law in Support of Their Response to Defendants' Motion for Partial Summary Judgment ("Pls.' Mem.") at [10]-[13].

### 1. Clifton Heights is Not Liable for Failure to Train Sgt. Brown

To show municipal liability on a failure-to-train claim, the plaintiff must show deliberate indifference in an official policy or custom and that the inadequate training caused a constitutional violation. *See Grazier v. City of Philadelphia*, 328 F.3d 120, 124-25 (3d Cir. 2003). Usually, the failure to adequately train municipal employees will constitute deliberate indifference only where the failure has caused a pattern of constitutional violations. *Berg*, 219 F.3d at 276. Deliberate indifference may be established based on a single instance of a constitutional violation, however, the burden on a plaintiff is extremely high, *id.*, and the only hypothesized example involving a single instance is "arming officers without training them 'in the constitutional limitations on the use [of the arms.]'" *Id.* (quoting *Canton*, 489 U.S. at 390 n.10). Further, there must be "'a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.'" *Brown v. Muhlenberg Township*, 269 F.3d 205, 214 (3d Cir.2001) (quoting *Canton*, 489 U.S. at 385).

If the municipality provides training to its police officers regarding the subject matter of the plaintiff's allegations and the defendant officer attended that training, the municipal training will be deemed adequate and not constitute deliberate indifference.[3] *Carswell v. Borough of Homestead*,

---

[3] In *Carswell*, the plaintiff's decedent – who was violent and actively fleeing police officers at the time of his death– was killed by a police officer after the decedent failed to heed the officer's warning to stop and ran straight at the officer, who was pointing his weapon at the decedent. *Carswell v. Borough of Homestead*, 381 F.3d 235, 238 (3d Cir.

381 F.3d 235, 245 (3d Cir. 2004). The defendant municipality's case is further strengthened if the police manual covers the subject matter of the plaintiff's allegations.[4] *Id.*

At the summary judgment stage, the evidence must be viewed in the light most favorable to the nonmoving party. *Smith v. Mensinger*, 293 F.3d 641, 647 (3d Cir. 2002). Russell contends that Sgt. Brown rubbed his hands over her breasts and between her legs while they were alone in a holding cell at the Clifton Heights Police Department. Complaint at ¶ 24. Although Sgt. Brown denies these allegations, Deposition of Sergeant Stephen Brown ("Brown Dep") at 31, viewing the evidence in the light most favorable to Russell, the court must infer, solely for the purpose of ruling on Clifton Heights' motion, that Sgt. Brown made inappropriate contact with Russell. Nonetheless, other undisputed evidence in the record shows not only that no Clifton Heights' policy or custom allows such conduct but also that Sgt. Brown was specifically trained how to avoid inappropriate physical contact with female detainees.

Clifton Heights police officers are required to be trained and certified under the Municipal Police Officer Education Training Commission, which includes graduation from an accredited police academy, mandatory annual training, psychological and physical tests, and an in-depth background check. Def.'s Mem. at 7; Def.'s Mem., Exhibit D (Stine Expert Opinion Report ("Stine Report")) at 20-21. These requirements conform to generally accepted practices for all Pennsylvania police departments. Stine Report at 20. At the time of the incident at issue, Clifton Heights maintained a policy on searching females by police officers. Pls.' Mem., Exhibit E at 2 (Control of Prisoners Policy IV.b.4). The policy states that "[f]emales may be searched only with another officer present

---

2004). The evidence indicated that the municipality's annual in-service courses covered relevant court opinions on the use of force and the officer who shot decedent had attended those courses. *Id.* at 245.

[4]In *Carswell*, the evidence demonstrated that the police chief had updated the police manual two years before the shooting and required his officers to be familiar with the updated manual, which included the continuum of force. *Carswell*, 381 F.3d at 245.

and only to that degree that assures she has no weapons available to her immediate control." *Id*. Thus, male officers cannot strip-search females, but may use a metal detector to search a "handbag, purse, wallet, coat and pockets" for weapons. *Id*.

Sgt. Brown attended the Delaware County Community College Police Academy and the Constable Academy. Brown Dep. at 15-16, 18. His training included recommended pat-down procedures for women and learning that constitutional violations of female detainees' rights could arise based on intentional sexual touching. Brown Dep. at 24-25. If required to pat down a woman, Sgt. Brown was trained to use the back of his hand and never to touch "between their legs, and never around their breast area." *Id*. at 27. It was his responsibility as a Clifton Heights police officer to be familiar with the department's policies. *Id.* at 37. He was aware of the Clifton Heights' Control of Prisoners Policy in place in 2007, regarding the search of female prisoners. *Id*. at 48-49.

Clifton Heights' training and policy concerning the way female detainees are searched is at least as extensive as the use of force training provided to the police officers in *Carswell*. *See Carswell*, 381 F.3d at 245. Hence, as in *Carswell*, Clifton Heights cannot be liable to Plaintiffs for inadequate training concerning how female detainees are searched. *Id.* Evidence that Sgt. Brown received training on the proper methods for searching female detainees is undisputed in the record. *See* Brown Dep. at 24-25. The training Sgt. Brown received and Clifton Heights' policy on searches of women show that Clifton Heights was concerned about and appropriately instructed officers about the rights of citizens with whom its officers would come into contact. Sgt. Brown was aware of Clifton Heights' policy, the constitutional limits on searching female suspects, and the potential for a constitutional violation were he to inappropriately touch a female suspect. Therefore, if Sgt. Brown did make inappropriate sexual contact with Russell, he was acting outside of, not under, any

Clifton Heights' policy or custom. Thus, Clifton Heights cannot be held liable in this instance. *See e.g., Monell*, 436 U.S. at 694 (holding that a municipality can be liable under § 1983 only when execution of the municipality's policy or custom causes an injury).

Plaintiffs present a 2003 incident of possible wrongdoing by Sgt. Brown to buttress their inadequate training claim. Pls.' Mem. at [11]. The prior allegation was that Sgt. Brown used a metal detector to inappropriately touch a female detainee. *Id.*, Exhibit F at [4]-[5]. In that incident, however, Clifton Heights' policy appears to have been followed inasmuch as the evidence shows that Sgt. Brown was not alone with the complaining woman at the time of the search and did not touch her inappropriately with a metal detector. *Id.*, Exhibit F at [6]-[7]. This isolated incident, in which there was no established constitutional violation, does not demonstrate a lack of training concerning searches of female detainees that amounted to deliberate indifference, nor does it demonstrate a pattern of constitutional violations that should have alerted Clifton Heights to an inadequate training program. In short, the record does not meet Plaintiffs' high burden of proving deliberate indifference, nor does it show that Clifton Heights' actions caused a constitutional violation; accordingly, Plaintiffs' municipal liability claim based on failure to train must be dismissed.

### 2. Clifton Heights is not Liable for a Failure to Investigate

A municipality's failure to adequately investigate or discipline officers for claims of misconduct may amount to a custom, yielding municipal liability under § 1983. *See Beck v. City of Pittsburgh*, 89 F.3d 966, 971, 974-75 (3d Cir. 1996). To avoid § 1983 liability, a municipality's investigative process "must be real. . . . It must answer to the citizen by providing at least a rudimentary chance of redress when injustice is done." *Beck*, 89 F.3d at 974.

Plaintiffs argue that Clifton Heights had a custom of failing to adequately investigate

complaints against its police officers and, therefore, condoning alleged inappropriate behavior. Pls.' Mem. at [12]. They contend that the harm caused to Russell would have been avoided had Clifton Heights properly investigated the 2003 incident in which Sgt. Brown allegedly used a metal detector to inappropriately touch a female detainee while another officer was in the room. *Id.* They complain that the police officers' version of events was, "blindly accepted over the citizens," with Clifton Heights manifesting "no interest in probing the credibility of the officer under investigation." *Id.* (quoting *Beck*, 89 F.3d at 973).

In *Beck*, the Pittsburgh police officer accused of using excessive force against Beck had five complaints of excessive force in five years. 89 F.3d at 972. Each complaint was investigated by a city agency and its findings were reported to the Chief of Police, *id*. at 968 & n.4, 969-70, however, the complaints were not examined cumulatively. *Id.* at 969. A complaint would be deemed "not sustained" whenever the agency could not prove or disprove the allegations.[5] *Id.* The city agency produced year end reports concerning its investigations. *Id.* at 970. The 1994 report revealed that the agency had only sustained 3.4% of all use of force complaints from 1990-1994. *Id.* The 1991 report identified problems with the agency's review of citizens's allegations of excessive force; it found that, although excessive force was admittedly an issue in the city, actual discipline for excessive force was very low. *Id.*

Beck had been assaulted by a police officer who had generated five excessive force complaints in five years and asserted that, if the city had properly investigated and disciplined its officers, that officer "would not have pursued a settled practice of applying excessive force in

---

[5]Beck argued that the preponderance standard used by the agency mandated that the agency would not sustain any complaint when the only evidence was the complainant's testimony and the police officer's denial. 98 F.3d at 969. The agency's head disputed that but conceded that a "not sustained" finding meant the evidence was a "draw." *Id.* Further, the agency's 1991 report stated that "Most cases cannot be sustained because it is usually the officer and the complainant on the scene only; and no neutral evidence is available." *Id.* at 970.

arresting citizens," and Beck would not have been assaulted. *Id*. at 972. The Third Circuit found that the "written complaints [against that officer] were sufficient for a reasonable jury to infer that the Chief of Police of Pittsburgh and his department knew, or should have known," of the officer's violent behavior when arresting citizens. *Id.* at 973. The five complaints, similar in nature, arose during a narrow period of time, with some incidents occurring within months of each other. *Id*. Hence, the court further found that the investigative procedure was deficient. *Id*. at 974.

Unlike the plaintiff in *Beck*, Plaintiffs here fail to point to a series or pattern of complaints against Sgt. Brown akin to issues Russell alleges, let alone a pattern taking place over a short time span. Further, there is no evidence that Clifton Heights' investigation of the 2003 incident was ineffectual, as in *Beck*. The 2003 investigation comprised of writing down the accounts of both police officers who were present – Sgt. Brown and Officer John C. Martin. *Id*. at [4]-[5]. Sgt. Brown stated that he did not place the metal detector between complainant's legs or breasts. *Id*. at [4]. Officer Martin, who witnessed the search, stated that Sgt. Brown was never "unprofessional or inappropriate." *Id*. at [5]. The complainant did not submit a written complaint or lodge a complaint with the District Attorney's Office, as she was advised to do by the chief of police. *Id*. at [4]. Rather, when making her telephonic complaint to the chief of police, the complainant spoke to him in a vulgar manner and threatened to have him fired. *Id.* at [5]. Complainant, thus, ignored available avenues to seek redress, to the extent that she was unsatisfied with Clifton Heights' investigation. Notably, the account given by the observing officer – Officer Martin – matches that of Sgt. Brown. Further, the department had no prior or subsequent reported similar incidents against Sgt. Brown or any other Clifton Heights police officers.

The investigation of the 2003 allegation was sufficient to discover any impropriety, but none

was found; so there was no reason to discipline Sgt. Brown, and, unlike in *Beck*, there was no pattern of similar alleged impropriety against Sgt. Brown or any other Clifton Heights police officer. Hence, Clifton Heights was not on notice of the potential for a constitutional violation based on the prior allegation of improper searching of women. *Cf. Beck*, 89 F.3d at 973 (noting that a pattern of similar complaints against the defendant officer, communicated to the chief of police, should have alerted him and the city to the officer's propensity for violence when making arrests). This court finds that Clifton Heights was not deliberately indifferent to the constitutional rights of its citizens and Plaintiffs' municipal liability claim based on a failure to investigate the 2003 incident must be dismissed.

**B.    Russell's Claims Against Sergeant Brown**

   **1.    Russell's Substantive Due Process Claim is Dismissed**

Sgt. Brown asserts that Russell cannot maintain her Count III substantive due process claim against him based on allegations of excessive force, because it is redundant to her Count II Fourth Amendment excessive force claim. Def.'s Mem. at 3. He maintains that, under the governing Supreme Court precedent, Russell must bring her excessive force claim solely under the Fourth Amendment, because she alleges that the excessive force was employed in the context of her arrest. *Id.* at 3-4. Russell concedes that she cannot maintain a substantive due process count, since her claim arises under the Fourth Amendment. Pls.' Mem. at [2]. Hence, summary judgment will be granted with respect to Russell's Count III substantive due process claim.[6]

---

[6]The Supreme Court has held that all claims of excessive force in the course of an arrest, investigatory stop or other seizure of an individual must be analyzed under the Fourth Amendment, not under substantive due process. *Graham v. Connor*, 490 U.S. 386, 395 (1989). Hence, Russell cannot maintain a substantive due process claim against Sgt. Brown based upon his conduct during her arrest. *Id.*

### 2. Russell's Bystander Liability Claim is Dismissed

Sgt. Brown argues that all of Russell's allegations involve his own actions and she has no allegations of wrongful conduct by any other officer that he could have reasonably prevented. Def.'s Mem. at 8. Hence, he maintains that a bystander liability claim cannot lie against him. *Id.* Plaintiff concedes that she cannot maintain a bystander liability claim against Sgt. Brown. Pls.' Mem. at [2]. Hence, summary judgment will be granted with respect to Russell's Count IV bystander liability claim against Sgt. Brown.

### C. Cianfrani's Excessive Force Claim Against Sergeant Brown

In his opening brief, Sgt. Brown argued that Cianfrani lacks evidence that she suffered any injury. Def.'s Mem. at 8. As a result, Cianfrani cannot maintain an excessive force claim against him; in addition, the lack of injury entitles Sgt. Brown to qualified immunity. *Id.* Alternatively, Sgt. Brown argued that Cianfrani has admitted that he did not handcuff her, hence, he is not liable to her. *Id.*

In his reply, Sgt. Brown argues that he cannot be liable for any excessive force in handcuffing Cianfrani because, although he ordered the handcuffing, he had left the scene by the time Police Officer Robert McCaughan obeyed his order to handcuff Cianfrani and he did not witness it. Memorandum of Law in Support of Defendants' Reply to Plaintiffs' Response to the Defendants' Motion for Partial Summary Judgment ("Reply") at 4-5. Sgt. Brown also alters his qualified immunity argument. Reply at 5-6. Thus, Sgt. Brown has abandoned his "no injury" argument and, instead, maintains that he is entitled to qualified immunity because he could not have known that the handcuffs were placed too tightly on Cianfrani's wrists (since he did not witness the handcuffing or her complaints about it) and he was not yet aware that Cianfrani was not involved in the Carney

burglary he was investigating. *Id.* at 6. The court will first address Sgt. Brown's argument that he is not liable to Cianfrani because he did not personally handcuff her.

1. **Sergeant Brown May Be Vicariously Liable for Cianfrani's Tight Handcuffing**

In his initial brief, Sgt. Brown failed to cite any evidence establishing that Cianfrani has admitted that he did not handcuff her. In the complaint, Cianfrani alleged that Sgt. Brown, or another officer, handcuffed her. Complaint at ¶ 19. However, Cianfrani testified upon deposition that Sgt. Brown directed Police Officer Robert McCaughan to handcuff her, Deposition of Joyce Cianfrani ("Cianfrani Dep.") at 35; Officer McCaughan and Sgt. Brown confirm that Sgt. Brown ordered Officer McCaughan to handcuff Cianfrani and that he did so. Deposition of Robert McCaughan ("McCaughan Dep.") at 47-48; Deposition of Sergeant Stephen Brown ("Brown Dep." at 88).

At the summary judgment stage, the evidence must be viewed in the light most favorable to the non-moving party. *Smith v. Mensinger*, 293 F.3d 641, 647 (3d Cir. 2002). Viewed in this light, the evidence indicates that Sgt. Brown directed Officer McCaughan to handcuff her and that Officer McCaughan complied. This would allow a jury to infer that Sgt. Brown is liable for the acts of Officer McCaughan. *See Berg v. County of Allegheny*, 219 F.3d 261, 272 (3d Cir. 2000) (*per curiam*) (explaining that § 1983 liability extends beyond the seizing officer to other officials whose intentional actions caused the seizing officer to act). Hence, Sgt. Brown cannot be granted summary judgment based solely upon his failure to actually place handcuffs on Cianfrani.

2. **Sergeant Brown is Entitled to Qualified Immunity**

In his opening brief, Sgt. Brown argued that Cianfrani could not maintain an excessive force claim against him because she suffered no injury; further, he maintained that the lack of injury

indicated that he was entitled to qualified immunity. Def.'s Mem. at 8. Sgt. Brown has abandoned that argument and now maintains that he is entitled to qualified immunity because he could not have known that the handcuffs were placed too tightly on Cianfrani's wrists (since he did not witness the handcuffing or her complaints about it) and he was not yet aware that Cianfrani was not involved in the Carney burglary he was investigating. Reply at 6. Sgt. Brown's second argument (concerning Carney) relates to whether he would be entitled to qualified immunity with respect to Cianfrani's false arrest claim in Count I; however, he has not moved for summary judgment with respect to Count I, hence, it will not be discussed here.

To be entitled to qualified immunity, Sgt. Brown must demonstrate either that the record evidence, viewed in the light most favorable to Cianfrani, does make out a Fourth Amendment violation or that the right at issue was not clearly established at the time he acted. *See e.g., Pearson v. Callahan*, ___ U.S. ___, ___, 129 S. Ct. 808, 815-16 (2009) (explaining that there are two steps to evaluating assertions of qualified immunity). Sgt. Brown maintains that he is entitled to qualified immunity on Cianfrani's excessive force claim because, at the time Officer McCaughan handcuffed Cianfrani, he had already left the scene and did not witness the alleged excessive force. Reply at 6. Sgt. Brown also argues that Cianfrani cannot make out an excessive force claim based on Officer McCaughan's handcuffing of her because Cianfrani concedes that, after she complained to Officer McCaughan that the handcuffs were too tight, Officer McCaughan loosened them. *Id.* at 4-5. The record reflects that Cianfrani asked Officer McCaughan to loosen the handcuffs while they were still at the scene and that he did so. *See* Cianfrani Dep. at 41; McCaughan Dep. at 61.

In order to make out a claim for excessive force, Cianfrani must show that she was seized and that the force used to effectuate her seizure was unreasonable. *Kopec v. Tate*, 361 F.3d 772, 776

-14-

(3d Cir. 2004). Sgt. Brown does not argue that Cianfrani was not seized, hence, the only question is whether the force used was unreasonable. A non-exhaustive list of factors relevant to determining the reasonableness of the force employed during a seizure include: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officer or others; (3) whether the suspect is actively resisting being seized or attempting to evade seizure by flight; (4) the possibility that the suspect is violent or dangerous; (5) the duration of the police action; (6) whether the police action takes place in the context of effecting an arrest; (7) the possibility that the suspect may be armed; and (8) the number of persons the officer must contend with at one time. *Kopec*, 361 F.3d at 776-77 (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989) (the first three factors); *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997) (the last five factors)).

*Kopec* establishes that an excessive force claim can be maintained based on handcuffs that are too tight. *Kopec,* 361 F.3d at 777. However, the Third Circuit cautioned that *Kopec* should be read narrowly because the court did "not intend to open the floodgates to a torrent of handcuff claims." *Id.* Mindful of this advice, this court concludes that Cianfrani's facts are not analogous to those in *Kopec*, hence, she cannot make out an excessive force claim.

In *Kopec*, the Third Circuit considered that: Officer Tate placed handcuffs on Kopec which were excessively tight and failed to respond to Kopec's repeated requests that he loosen the handcuffs; the tight handcuffs were in place for ten minutes before Officer Tate loosened them; Kopec suffered permanent nerve damage to his right wrist; and Officer Tate was not apprehending other people or engaged in imperative matters when Kopec repeatedly asked him to loosen the handcuffs. *Kopec*, 361 F.3d at 777.

Herein, although initially Officer McCaughan placed the handcuffs on too tightly, as soon

as Cianfrani complained, he loosened them. Unlike in *Kopec*, Officer McCaughan did not ignore Cianfrani's request to loosen the handcuffs, but rather, promptly gave relief. Accordingly, this court concludes that Cianfrani cannot make out an excessive force claim based upon initially tight handcuffs,[7] and Sgt. Brown is entitled to qualified immunity on this claim. *See Pearson*, 129 S. Ct. at 818 (noting that it is permissible to resolve a qualified immunity claim on the ground that the relevant facts do not make out a constitutional violation).

---

[7] Sgt. Brown infers that Cianfrani suffered no injury because her medical records indicate she was never treated for any injury to her wrists after the January 13, 2007 incident. Reply at 2. However, the record he relies upon is a letter Plaintiff's counsel wrote to Cianfrani's treating physician asking if the doctor had any records concerning an incident that took place on January 6, 2007. Reply, Exhibit DR-3. This is the wrong date, since the incident took place on January 13, 2007. Further, Cianfrani testified that, when she saw her doctor and complained about her wrist injury, she did not tell the doctor what had caused the injury. Cianfrani Dep. at 78. Cianfrani also said that her doctor treated her injury with wrist splints for one year and medication. *Id.* at 83, 85, 94. This evidence, at least, creates a genuine issue concerning whether Cianfrani suffered any injury as a result of her handcuffing. Nonetheless, the court finds that this issue of fact is not material in light of the promptness with which Officer McCaughan responded to Cianfrani's complaints about the handcuffs.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Partial Summary Judgment is hereby granted in part and denied in part. Defendants' Motion for Partial Summary Judgment is Granted with regard to Plaintiff Lisa Russell's substantive due process and bystander liability claims (Counts III and IV, respectively), Plaintiff Joyce Cianfrani's excessive force claim against Sgt. Stephen Brown (Count II) and Plaintiff's Russell and Cianfrani's *Monell* claim (Count V) against Defendant Borough of Clifton Heights. Plaintiffs Russell and Cianfrani's unlawful seizure claims against Defendant Sgt. Brown (Count I), Plaintiff Russell's excessive force claim against Sgt. Brown (Count II) and Plaintiff Cianfrani's bystander liability claim against Sgt. Brown (Count IV) shall proceed to trial.

Inasmuch as all claims against Defendant, BOROUGH of CLIFTON HEIGHTS, are being dismissed, the caption of this matter should be amended to delete any reference to it.

An implementing order will be issued today.

BY THE COURT:

*/s/ Carol Sandra Moore Wells*
CAROL SANDRA MOORE WELLS
UNITED STATES MAGISTRATE JUDGE